**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Cochran & Pease, LLC d/b/a Terri*
*Debtor and Debtor-In-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
smarkowitz@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

Cochran & Pease, LLC d/b/a Terri,

                    Debtor.

-----------------------------------------------------------x

Chapter 11

Case No.: 19-10903 (JLG)

## DEBTOR'S DISCLOSURE STATEMENT TO ACCOMPANY ITS PLAN OF LIQUIDATION

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ..................................................................................................1

I. INTRODUCTION.................................................................................................................1

CAUTIONARY STATEMENT ................................................................................................4

    A.   SUMMARY OF CLASSIFICATION AND TREATMENT ................................................4

II. VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN ...................................5

    A.   MANNER OF VOTING ON PLAN ..................................................................................5
    B.   CLAIM HOLDERS ENTITLED TO VOTE ......................................................................6
    C.   CLASSES IMPAIRED UNDER THE PLAN ......................................................................7
    D.   VOTE REQUIRED FOR CLASS ACCEPTANCE ..............................................................7

III. THE DEBTOR AND ITS OPERATIONS ......................................................................7

    A.   GENERAL BACKGROUND............................................................................................7
        1.   *Pre-Petition* .........................................................................................................7

IV. THE CHAPTER 11 CASE.................................................................................................9

        1.   *The Chapter 11 Filing* ......................................................................................9
        2.   *Retention of Counsel* .........................................................................................9
        3.   *Motion To Use Cash Collateral* ......................................................................10
        4.   *Motion to Extend Time to Assume or Reject Non-Residential Real Property Leases and to Assume Such Leases*.......................................................................................................11
        5.   *Bar Date and Objections to Claims* ................................................................11
        6.   *Post-Petition Operating Results* ......................................................................12

V. SUMMARY OF THE PLAN.............................................................................................13

    A.   GENERAL....................................................................................................................13
        1.   *Brief Explanation of Chapter 11* .....................................................................13
        2.   *Acceptance of the Plan* ....................................................................................14
        3.   *Classification of Claims and Equity Interests Generally* ................................14
    B.   CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN................15
        1.   *Unclassified Claims* .........................................................................................16
            (a)   United States Trustee Fees..........................................................16
            (b)   Administrative Claims.................................................................16
            (c)   Priority Tax Claims.....................................................................18
        2. *Class 1 – Timberland Bank's Secured Claim* .....................................................19
        3. *Class 2 – General Unsecured Claims* ................................................................19
        4. *Class 3 – Equity Interest Holders* ......................................................................20
    C.   CONDITIONS TO AND MEANS FOR CONSUMMATION OF THE PLAN..............................20
        1.   *Condition to Occurrence of the Effective Date* ...............................................20
        2.   *Funding of the Plan.* .........................................................................................20
    D.   OBJECTIONS TO CLAIMS ...........................................................................................20
    E.   RESOLUTION OF DISPUTED CLAIMS .........................................................................21
    F.   ESTIMATION ..............................................................................................................21
    G.   ALLOWANCE OF DISPUTED CLAIMS..........................................................................21
    H.   LIMITATION ON LIABILITY........................................................................................21
    I.   CERTAIN OTHER PROVISIONS OF THE PLAN.............................................................22
        1.   *Causes of Action.* .............................................................................................22
        2.   *Disbursing Agent.* ............................................................................................22
        3.   *Payments by Cash.* ...........................................................................................23
        4.   *Unclaimed Distributions.* .................................................................................23
        5.   *Executory Contracts and Unexpired Leases* ....................................................23
            (a)   Assumption and Rejection Generally...........................................23

      **(b)**    **Rejection of Executory Contracts and Unexpired Leases**............................................**24**
    **6.**   *Professional Fees and Expenses*..............................................................*24*
    **7.**   *Retention of Jurisdiction* ......................................................................*24*
    **8.**   *Management of the Reorganized Debtor* ...............................................*26*

**VI. CONFIRMATION PROCEDURES** ..............................................................................**26**

   **A.**   Sᴏʟɪᴄɪᴛᴀᴛɪᴏɴ Oꜰ Vᴏᴛᴇs; Aᴄᴄᴇᴘᴛᴀɴᴄᴇ...........................................................**26**
   **B.**   Cᴏɴꜰɪʀᴍᴀᴛɪᴏɴ Hᴇᴀʀɪɴɢ......................................................................**27**
   **C.**   Bᴇsᴛ Iɴᴛᴇʀᴇsᴛs Tᴇsᴛ........................................................................**29**
   **D.**   Cʀᴀᴍ Dᴏᴡɴ....................................................................................**29**

**VII. CERTAIN FEDERAL INCOME TAX CONSIDERATIONS** ...............................**30**

    **1.**   *Tax Effect of Plan* ................................................................................*30*
       **A.**    **Federal Income Tax Consequences to Holders of Claims**...........................**32**
       **B.**    **Federal Income Tax Consequences of the Transactions Contemplated Under the Plan to the Debtor and the Debtor's Members.** .................................................................**33**
    **1.**   *Limited Liability Company* ...................................................................*34*
    **2.**   *Continuation of the Partnership* ...........................................................*35*
    **3.**   *Partnership Recognition of Cancellation of Indebtedness Income* ..............*35*
    **4.**   *Tax Return Filings and Substantial Authority* .......................................*36*
    **5.**   *Interest and Penalties* ..........................................................................*37*

**VIII. VOTING INSTRUCTIONS** .........................................................................................**37**

**IX. CONCLUSION** ................................................................................................................**38**

## DISCLOSURE STATEMENT

On March 27, 2019 (the "Filing Date"), Cochran & Pease, LLC (the "Debtor") filed a voluntary Chapter 11 petition with the United States Bankruptcy Court for the Southern District of New York.  Since the Filing Date, the Debtor has remained in possession of its assets and has continued to own, operate and manage its business affairs pending the approval of a plan of liquidation in accordance with the provisions of Title 11 of the United States Code (the "Bankruptcy Code").

Pursuant to §1125 of the Bankruptcy Code, the Debtor now submits this disclosure statement (the "Disclosure Statement") relating to its proposed plan of liquidation dated January 21, 2020 (the "Plan").

## I

## INTRODUCTION

The Debtor provides this Disclosure Statement to all of the Debtor's known creditors, Equity Interest Holders and other parties in interest in order to provide adequate information to enable them to make an informed decision on whether to accept or reject the Plan.   All holders of claims and Equity Interests are hereby advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.

The Plan summary and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan (a copy of which accompanies this Disclosure Statement as **Exhibit "A"**).[1]

By order of the Bankruptcy Court dated March ____ 2020, this Disclosure Statement has been approved as containing adequate information of a kind and in sufficient detail to enable creditors of the Debtor to make an informed judgment about the Plan.

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings assigned to them in the Plan.

However, the Court's approval of the Disclosure Statement does not constitute a recommendation by the Court either for or against the Plan.  No statements or information concerning the Plan and the transactions contemplated thereby have been authorized, other than the statements and information set forth in this Disclosure Statement.  All other statements regarding the Plan and the transactions contemplated, whether written or oral, are unauthorized.

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for **April ___, 2020 at ____ A.M.** at the United States Bankruptcy Court located at One Bowling Green, New York, New York 10004.  This hearing may be adjourned from time to time without further notice other than by announcement in Court on the scheduled date of such hearing.  At that hearing, the Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code. The Court will then also receive and consider a ballot report prepared by the Debtor concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote.

**No representations concerning the Debtor, the estimated value of the Debtor's property and/or the estimated assets to be generated from the liquidation of the Debtor's assets, are authorized by the Debtor other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance which are other than as contained in this Disclosure Statement, should not be relied upon by you in casting your vote with respect to the proposed Plan.**

***THE DEBTOR BELIEVES THE PLAN PROVIDES THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO ALL CREDITORS UNDER THE CIRCUMSTANCES.  THE DEBTOR, THEREFORE, BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF EACH AND EVERY CLASS OF CREDITORS AND RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.***

This Disclosure Statement is based upon information available to the Debtor as of January 17, 2020 and does not reflect events that may occur subsequent to that date, which may have a material impact on the information contained in this Disclosure Statement. The Debtor will not make any effort to supplement or amend this Disclosure Statement to reflect changes subsequent to the date hereof.

THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF. **HOWEVER, THE DEBTOR AND ITS ADVISORS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR THAT THE INFORMATION CONTAINED HEREIN IS FREE FROM ANY INACCURACY OR OMISSION.**

NOTHING IN THIS DISCLOSURE STATEMENT IS OR SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE DEBTOR FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION, BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS GOVERNED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER STATUTE OR RULE OF SIMILAR IMPORT.

ALTHOUGH THE DEBTOR'S PROFESSIONAL ADVISORS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON THE FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING THE FINANCIAL, BUSINESS AND ACCOUNTING DATA PROVIDED BY THE DEBTOR, THE DEBTOR'S PROFESSIONAL ADVISORS HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND MAKE NO REPRESENTATIONS OR WARRANTIES AS TO SUCH INFORMATION. SUCH PROFESSIONAL ADVISORS DO

NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR IS FREE FROM ANY INACCURACY OR OMISSION.

## CAUTIONARY STATEMENT

CERTAIN INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, AND THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995, AS AMENDED. SUCH FORWARD-LOOKING INFORMATION IS BASED ON INFORMATION AVAILABLE WHEN SUCH STATEMENTS ARE MADE AND IS SUBJECT TO RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPRESSED IN THIS DISCLOSURE STATEMENT.

**A.**    **Summary of Classification and Treatment**

Detailed elsewhere in this Disclosure Statement is a description of the technical aspects of the classification of Claims and Equity Interests, the relative allocations of property to holders of such Claims and interests, the methodology as to how such property is to be distributed, the risks inherent in the proposed Plan, and the applicable bankruptcy and tax consequences of the proposed liquidation. However, the Debtor believes that a broad overview of what, in the opinion of the Debtor, Creditors and Equity Interest Holders are likely to receive under the Plan, will be helpful for your consideration of whether you wish to accept or reject the Plan.

The following is a summary of the classification of all Claims and Equity Interests under the Plan and the proposed treatment of each such Class under the Plan. This summary is qualified in its entirety by reference to provisions set forth in the Plan, the terms of which are controlling.

| CLASS | DESCRIPTION | KIND OF PROPERTY DISTRIBUTED TO CLASS | PROJECTED ULTIMATE DISTRIBUTION AS PERCENTAGE OF ALLOWED CLAIM |
|---|---|---|---|
| Administrative (unclassified) | a.  Professional Fees and Expenses | Cash | 100% on the Effective Date as allowed by Court or as agreed between the holder of such claim and the Reorganized Debtor. |
| | b.  Accounts payable and other obligations which arose post-petition | Cash | 100% on the Effective Date or as may be paid in the ordinary course of business. |
| Priority Tax Claims (unclassified) | Tax Claims | Cash | 100% of Allowed Priority Tax Claims paid no later than July 31, 2020. In the event there are insufficient funds to pay the full amount of such Allowed Priority Tax Claims, the Debtor's responsible persons shall make arrangements with the relevant taxing authority to personally pay such Allowed Priority Tax Claims over time. |
| Class 1 | Timberland Bank's Secured Claim | Cash | No later than July 31, 2020, the Debtor shall pay $20,000.00 to Timberland Bank in full satisfaction of its Class 1 Allowed Secured Claim. The balance of Timberland Bank's Claim of approximately $438,000.00 shall be treated as a Class 2 Unsecured Claim. |
| Class 2 | General Unsecured Claims | Cash | No later than July 31, 2020, all holders of Allowed Unsecured Claims shall receive their Pro Rata share of $20,000.00. |
| Class 3 | Equity Interest Holders | None | N/A |

## II

## VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN

A.    **Manner of Voting On Plan**

Before voting, this Disclosure Statement as well as the Plan should be read in its entirety. You should only use the ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan.

**If you hold a Claim in Classes 1 and 2, included in the package of materials forwarded to you along with the Disclosure Statement and Plan is the enclosed ballot for your acceptance or rejection of the Plan.  You should complete, date and sign your ballot**

**and return it to Tarter Krinsky & Drogin LLP, Attention: Scott S. Markowitz, Esq., 1350 Broadway, New York, New York 10018, attorneys for Debtor.  All ballots must be received by 5:00 P.M. on April __, 2020.  Any ballot which is properly executed but does not indicate acceptance or rejection of the Plan shall be deemed to be an acceptance of the Plan.**

**B.    Claim Holders Entitled To Vote**

Under the Bankruptcy Code, any holders of Claims or Equity Interests in Classes that are "impaired" under the Plan are entitled to vote to accept or reject the Plan, unless such Class of Claims neither receives nor retains any property under the Plan (in which case such Class is deemed to have rejected the Plan).  Bankruptcy Code §1124 provides generally that a Class is impaired if the legal, equitable or contractual rights of the Claims or interests in that Class are altered.

Subject to the exceptions provided below, any holder whose Claim is impaired under the Plan is entitled to vote if either (i) its Claim has been scheduled by Debtor and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) such Claim holder has filed a proof of Claim with respect to a Disputed Claim.

A holder of a Disputed Claim is not entitled to vote on the Plan unless such Claim is temporarily allowed by the Debtor or by an order of the Bankruptcy Court in an estimated amount which it deems proper for the purpose of voting to accept or reject the Plan.  In other words, only holders of Allowed Claims or Equity Interests may vote to accept or reject the Plan. A Claim or Equity Interest to which an objection has been filed by the Debtor or any other party-in-interest not later than March 30, 2020, or a claim (i) which is listed on the Debtor's Schedules as disputed, unliquidated or contingent, and (ii) with respect to which a superseding proof of claim has not been filed is not an Allowed Claim for voting purposes, unless the Claim is settled by agreement or the court allows the Claim (in whole or in part) by Final Order.  Upon request of

a party-in-interest, the court may temporarily allow or estimate a Disputed Claim or Equity Interest for purpose of voting on the Plan.  Ballots cast in respect of claims other than Allowed Claims will not be counted.  In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the creditor is not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**C.**    **Classes Impaired Under the Plan**

Claim holders in Class 1 and 2 are impaired under the Plan and are eligible, subject to the limitations set forth above, to vote to accept or reject the Plan.  Any controversy as to whether any Claim or Equity Interest Holder or Class of Claim or Equity Interest Holders is impaired under the Plan shall, after notice of any hearing, be determined by the Bankruptcy Court.

**D.**    **Vote Required For Class Acceptance**

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a Class of impaired Claims as acceptance by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of Allowed Claims in that Class who cast ballots.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a Class of Equity Interest Holders as acceptance by holders of at least two-thirds (2/3) in amount of the allowed interests of such class who cast ballots.

## III

## THE DEBTOR AND ITS OPERATIONS

**A.**    **General Background**

**1.**    **Pre-Petition**

The Debtor is a New York limited liability company which is engaged in the business of operating a quick casual vegetarian restaurant offering in-house dining, take-out, delivery and catering in Manhattan's Chelsea neighborhood. The Debtor's restaurant is located in a portion of the building known as 60 West 23rd Street, New York, New York (the "23rd Street

Property"). The Debtor commenced operations at the 23rd Street Property in 2010. The Debtor operates the restaurant under the trade name Terri. The lease expires in or about June 30, 2020 (the "23rd Street Lease"). The current monthly base rent under the 23rd Street Lease is approximately $4,650.00. The Debtor has always operated profitably. The Debtor's primary Equity Interest holders are Michael Pease and Craig Cochran. Together they own approximately 65% of the Debtor's Equity Interest. Six (6) other individuals own the balance of the Debtor's Equity Interest. Aside from the 23rd Street Lease, the Debtor leases a portion of the third floor of the property located at 10-40 45th Avenue, Long Island City, NY 11101 pursuant to a lease dated May 25, 2017 (the "Long Island City Lease"). The monthly rent under the Long Island City Lease is $4,900.00. The Debtor utilizes these premises as a commercial kitchen to supply the restaurant. The Long Island City Lease expires in June 2020. The 23rd Street Lease and the Long Island City Lease are collectively referred to herein as the "Leases."

Seeking to capitalize on the Debtor's success, between 2012 and 2015, the Debtor's owners opened two additional restaurants, one located at 100 Maiden Lane and the other at 635 Third Avenue in Manhattan. These two additional restaurants were formed as separate limited liability companies. In order to finance the new restaurants, the Debtor borrowed monies which were secured by all of the Debtor's assets as well as the assets of the newly opened restaurants. The Debtor borrowed funds from American Express National Bank ("Amex") and Timberland Bank ("Timberland") to finance the new restaurant locations.

Unfortunately, the opening costs for the new locations far exceeded the budget and both new restaurants failed to be consistently profitable. In order to maintain operations, the Debtor's owners were forced to take additional loans at increasingly higher interest rates. By October 2018, the Debtor's owners determined the most prudent course of action would be to close the new locations. This left the Debtor with tremendous debt compared to its assets and cashflow. The Debtor's management attempted to renegotiate modified payment terms with creditors, but

some of the creditors were unwilling to agree to payment arrangement the Debtor could afford. Amex filed a lawsuit in or about March 2019 against the Debtor seeking to collect approximately $320,000.00 on account of its outstanding loan.

In an effort to obtain a breathing spell from collection activity including litigation and to generally attempt to restructure its business, on the Filing Date, the Debtor filed a voluntary Chapter 11 petition with the United States Bankruptcy Court for the Southern District of New York.

**IV**

**THE CHAPTER 11 CASE**

1.      **The Chapter 11 Filing**

The Debtor's Chapter 11 Case was assigned to the Honorable James L. Garrity, Jr., United States Bankruptcy Judge.  The Bankruptcy Court has entered several orders in the Chapter 11 Case, each of which is available from the clerk of the Bankruptcy Court or may be viewed at the bankruptcy's court's worldwide website: www.nysb.uscourts.gov.  A PACER password is required to view all such documents.

2.      **Retention of Counsel**

Subsequent to the Filing Date, the Debtor remained in possession of its assets and property and continued to operate its business as a debtor-in-possession pursuant to §§1107 and 1108 of the Bankruptcy Code.  The Debtor's initial chapter 11 filing was made by Bryan Pease, an attorney in San Diego, California. Mr. Pease is the brother of Michael Pease, the Debtor's 30% Equity Interest Holder. In April 2019, the Debtor hired Anthony M. Vasallo, Esq. ("Mr. Vasallo") to represent it in this Chapter 11 case. Mr. Vasallo never submitted an application to be retained as Debtor's bankruptcy counsel. In or about July 2019, Mr. Vasallo became non-responsive to the Debtor's management's calls and emails. As a result, in or about October 1, 2019, the Debtor's management approached the firm of Tarter Krinsky & Drogin LLP and requested that they step in

and take over the Debtor's representation in the Chapter 11 case.  By order of the Court dated October 23, 2019, Tarter Krinsky & Drogin LLP was authorized to act as bankruptcy counsel for the Debtor *nunc pro tunc* to September 30, 2019.

### 3.      Motion To Use Cash Collateral

As set forth above, prior to the Filing Date, the Debtor had entered into loan agreements with Timberland and Amex. As of the Filing Date, Timberland asserted it was owed approximately $500,000.00 on account of various loans which had been from time to time extended and consolidated. Amex asserted it was owed approximately $319,000.00 pursuant to a loan made on or about August 2, 2008. Both the Timberland's loan and the Amex's loan were secured by substantially of the Debtor's personal property.  Both Timberland and Amex filed UCC-1 financing statements.  Although not entirely clear from the public records, it appears Timberland's loan is senior to the Amex's loan.

Because Timberland and Amex, both held perfected liens on the Debtor's cash receipts, the Debtor was required to file a motion to utilize cash collateral.  On or about April 4, 2019, the Debtor filed a motion pursuant to section 363(c)(2) of the Bankruptcy Code to utilize Timberland's and Amex's cash collateral.  Pursuant to an order dated July 18, 2019, the Debtor was authorized to utilize both Timberland's and Amex's cash collateral. The Debtor was required to make $7,500.00 per month adequate protection payment to Timberland and $1,000.00 per month adequate protection payment to Amex. In addition, both Timberland and Amex were granted replacement liens on the Debtor's post-petition property in the same priority as their respective interest prior to the Filing Date.  The Debtor is current on all adequate protection payments to Timberland and Amex.

**4.** **Motion to Extend Time to Assume or Reject Non-Residential Real Property Leases and to Assume Such Leases**

On July 25, 2019, the Debtor through Mr. Vasallo, filed a motion seeking to extend the Debtor's time to assume or reject the Leases.  The motion was scheduled to be heard on August 9, 2019. Upon information and belief, the Court did not consider the motion because it was filed under improper event.  The motion was filed under the event "Motion to Extend Time" rather than "Motion to Assume or Reject."  No order was ever entered with respect to the motion. Upon information and belief, the motion was served upon the Debtor's landlords. However, no affidavit of service related to the motion was ever filed on the docket.

The Bankruptcy Code provides that a non-residential real property lease is deemed rejected unless an order is entered assuming the lease within 120 days of the Chapter 11 filing or unless an order is entered extending this 120 day period. The Bankruptcy Code further provides that unless a commercial landlord expressly consents, the Court cannot extend a debtor's time to assume or reject a commercial lease beyond 210 days from the Chapter 11 filing date.  210 days from the Filing Date in the Debtor's Chapter 11 case was October 23, 2019.

Shortly after, Tarter Krinsky & Drogin LLP was retained, the Debtor filed two motions. One motion to extend the initial 120 day period, *nun pro tunc*, and a second motion to assume both the 23rd Street Lease and the Long Island City Lease. By order dated October 30, 2019, the Court extended the Debtor's time to assume or reject the Leases from July 25, 2019 to through and including October 23, 2019 [ECF. No. 54].  By order dated October 30, 2019, the Debtor was authorized to assume the Leases [ECF No. 53]. The Debtor is current with all pre and post-petition rent under the Leases.

**5.** **Bar Date and Objections to Claims**

By order dated October 16, 2009 (the "Bar Order"), the Bankruptcy Court established November 22, 2019 as the last date for creditors of the Debtor to file a proof of claim for

pre-petition claims (the "Bar Date").  In accordance with the Bar Order, the Debtor's bankruptcy counsel served a copy of the notice of the Bar Date upon all known creditors and other parties-in-interest.   The Debtor's management and professionals have reviewed the Claims filed by the creditors.   As of January 17, 2020, a total of twelve (12) claims have been filed in the Debtor's Chapter 11 Case.  For the most part, the Claims are consistent with the Debtor's books and records. However, the Debtor intends to file an objection to claim no. 12 filed by TCF Equipment Finance, which was filed as a secured claim for $35,000.00 and unsecured claim of $48,054.00. The entity which entered into the Equipment Lease Agreement with TCF Equipment Finance was Terri Vegetarian LLC and not the Debtor. TCF Equipment Finance repossessed the equipment and at most they hold an unsecured claim based upon the Debtor's guaranty of the equipment finance agreement.

To the extent the Debtor deems it prudent and/or cost effective to object to Claims, the Plan provides the Debtor has sixty (60) days from the Effective Date to file objections to filed claims.  If the Debtor fails to object to a properly filed claim on or before sixty (60) days from the Effective Date, then such Claim will be deemed allowed and will be entitled to the Distribution under the Plan applicable to the particular class such claim is a member of.

**6.**    **Post-Petition Operating Results**

According to the Debtor's monthly operating reports, from the Filing Date through December 31, 2019, the Debtor generated gross revenues of approximately $1,563,000.00 which has resulted in an operating profit exclusive of depreciation in the sum of approximately $50,000.00. Because the Debtor is a small business Debtor, the operating reports are prepared more on a cash basis so the actual profit on an accrual basis may be different. The Debtor has paid all its post-petition obligations in a timely fashion and has paid the adequate protection payment of $8,500.00 per month to Timberland and Amex.

V

## SUMMARY OF THE PLAN

The Debtor submits the treatment of Creditors under the Plan is more favorable than the treatment Creditors would receive if the Chapter 11 Case was converted to Chapter 7. Therefore, the Debtor submits the Plan is in the best interests of the Creditors and the Debtor and recommends acceptance of the Plan by holders of Claims in Classes 1 and 2.

**THE SUMMARY OF THE PLAN SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH CONTROL.**

A.    **General**

1.    **Brief Explanation of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself and its creditors and Equity Interest Holders. Upon the filing of a petition for reorganization under Chapter 11 and during the pendency of the case, the Bankruptcy Code imposes an automatic stay of all attempts to collect Claims or enforce Liens against the Debtor.

Confirmation and consummation of a plan of reorganization is the principal objective of a Chapter 11 case. In general, a plan divides the Claims against, and Equity Interests in, a debtor into separate Classes and allocates plan distributions among those Classes. If the legal, equitable and contractual rights of a Class are unaffected by the Plan, such Class is considered "unimpaired". All unimpaired Classes are deemed to have <u>accepted</u> the Plan and therefore are not entitled to vote thereon. Bankruptcy Code §1126(g), on the other hand, provides that all Classes of Claims and Equity Interests that do not receive or retain any property under the Plan on account of such Claims and Equity Interests are deemed to have <u>rejected</u> the Plan. All other Classes of Claims and Equity Interests are considered "impaired" and are entitled to vote on the Plan.

Under the Bankruptcy Code, acceptance of the Plan is determined by Class; therefore, it is not required that each holder of a Claim or Equity Interest in an impaired Class vote in favor of the Plan in order for the bankruptcy court to confirm the Plan. Generally, each impaired Class must vote to accept the Plan; however, the Bankruptcy Court may confirm the Plan in certain circumstances without the acceptance of all impaired Classes if at least one (1) impaired Class votes to accept the Plan and certain other statutory tests are satisfied. Many of these tests are designed to protect the interests of creditors and Equity Interest Holders who either do not vote or vote to reject the Plan but who will nonetheless be bound by the Plan if it is confirmed by the Bankruptcy Court.

2.    **Acceptance of the Plan**

As a condition to confirmation, Bankruptcy Code Section 1129(a) requires that: (a) each impaired Class of Claims or Equity Interests votes to accept the Plan; and (b) the Plan meets the other requirements of Section 1129(a). As explained above, Classes that are unimpaired are deemed to have accepted the Plan and therefore are not entitled to vote thereon, and Classes that do not receive or retain any property under the Plan are deemed to have rejected the Plan and likewise are not entitled to vote thereon. Accordingly, acceptances of the Plan are being solicited only from those parties who hold Claims or Equity Interests classified in impaired Classes that are to receive Distributions under the Plan.

An impaired Class of Claims will be deemed to have accepted the Plan if holders of at least two-thirds in dollar amount and a majority in number of Claims in such Class who cast timely ballots vote to accept the Plan.

3.    **Classification of Claims and Equity Interests Generally**

Bankruptcy Code Section 101(5) defines a Claim as: (a) a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"; or (b) a "right to

an equitable remedy for breach or performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

Bankruptcy Code Section 1123 provides that a plan of reorganization shall designate Classes of Claims against and Equity Interests in a debtor.  Bankruptcy Code Section 1122 further requires that each Class of Claims and Equity Interests contain only Claims or Equity Interests that are "substantially similar" to each other.  The Debtor believes that it has classified all Claims and Equity Interests in compliance with the requirements of Sections 1122 and 1123.  However, it is possible that a holder of a Claim or Equity Interest may challenge such classification and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In such event, the Debtor would, to the extent permitted by the Bankruptcy Court, modify the classifications in the Plan as required and use the acceptances received in this solicitation for the purpose of obtaining the approval of a Class or Classes of which the accepting holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class of which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.  Furthermore, a reclassification of Claims or Equity Interests could necessitate a resolicitation.

**B.**     **Classification and Treatment of Claims and Equity Interests Under the Plan**

The following describes the classification of Claims and Equity Interests under the Plan and the treatment that holders of Allowed Claims and Allowed Equity Interests are to receive if the Plan is confirmed and becomes effective.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest fits within the description of that Class and is classified in a different Class to the extent that any remainder of the Claim or Equity Interest fits within the description of such different Class.

## 1.   **Unclassified Claims**

The Plan does not classify Administrative Claims, statutory fees due to the United States Trustee, or Priority Tax Claims but does provide for the following treatment of such Claims.

(a)   **United States Trustee Fees.**   All fees payable by the Debtor under Section 1930 of Title 28 of the United States Code that have not been paid prior to the Effective Date shall be paid by the Debtor on the Effective Date.   In addition, the Debtor, or any successor thereto by merger, consolidation or otherwise, on or after the Effective Date, shall be liable for and the Disbursing Agent shall pay such fees until the entry of a final decree in this case or until the case is converted or dismissed.   The Disbursing Agent shall file post-confirmation operating reports with the Bankruptcy Court and the United States Trustee until its final decree in entered.

(b)   **Administrative Claims.**   An "Administrative Claim" is a Claim for payment of an administrative expense of a kind specified in Bankruptcy Code Section 503(b) and referred to in Bankruptcy Code Section 507(a)(2), including the actual and necessary costs and expenses of preserving the estate or operating the Debtor's business after the commencement of a Chapter 11 case, loans and advances made to the Debtor after the Petition Date, compensation for legal and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code Section 330(a) or 331, certain retiree benefits, certain reclamation Claims, and all fees and charges against the estate pursuant to Chapter 123 of Title 28 of the United States Code.

The Plan provides that each holder of an Allowed Administrative Claim (including, without limitation, the professionals' fees and expenses incurred by the Professional Persons and allowed in a Final Order of the Bankruptcy Court) shall be paid in full, in Cash, by the Disbursing Agent (i) on the later to occur of the Effective Date or the date the order allowing such Administrative Claim becomes a Final Order, or (ii) upon such other terms as may exist in the ordinary course of business of the Debtor; or (iii) upon such terms as may exist pursuant to

Order of the Bankruptcy Court or an agreement between such holder of an Allowed Claim and the Debtor.

The Debtor estimates the aggregate amounts due to professionals shall total approximately $20,000.00. This consists of the professional fees of Tarter Krinsky & Drogin LLP, bankruptcy counsel for the Debtor. Tarter Krinsky & Drogin LLP is the only professionals retained by court order. This is exclusive of the $15,000.00 retainer paid to Tarter Krinsky & Drogin LLP from a third party subsequent to the Filing Date.

With respect to the trade Claims arising after the Filing Date representing obligations incurred by the Debtor in the ordinary course of its business consistent with past practice, such trade claims shall be paid in the ordinary course of business. The Debtor estimates that post-petition ordinary course payables as of the Effective Date will be approximately $25,000.00. As to other Allowed Administrative Claims, except as otherwise provided in the Plan, the Plan provides that each holder of an Allowed Administrative Claim: (i) shall be paid by the Disbursing Agent on the later to occur of the Effective Date or the date the order allowing such Administrative Claim becomes a Final Order; and (ii) shall receive, on account of and in full satisfaction of such Allowed Administrative Claim, Cash equal to the amount thereof, unless the holder agrees to less favorable treatment of such Allowed Administrative Claim.

The Plan further provides that holders of Administrative Claims, including Claims of Professional Persons for services rendered during the Chapter 11 case, must file requests for payment within forty-five (45) days after the Confirmation Order.

Administrative Claims representing obligations incurred by the Debtor after the date and time of the entry of the Confirmation Order (including, without limitation, Claims for professionals' fees and expenses) shall not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Debtor in the ordinary course of business and without Bankruptcy Court approval. After the Confirmation Date, the Reorganized Debtor shall, in the ordinary course

of business and without the necessity for any approval by the Court, pay the reasonable fees and expenses of the Professional Persons employed by the Debtor in connection with the implementation and consummation of the Plan, the claims reconciliation process and any other matters as to which such Professionals may be engaged.  The Plan provides that the fees and expenses of such Professionals shall be submitted monthly to the Reorganized Debtor by such Professionals in the form of a detailed invoice therefor and shall be paid by the Reorganized Debtor upon such submission.  If the Reorganized Debtor disputes the reasonableness of any such invoice and, after attempting to resolve the dispute, all unresolved disputes shall be submitted to the Bankruptcy Court on notice to the Reorganized Debtor for a determination of the reasonableness of such invoice.

(c)    **Priority Tax Claims.**  A "Priority Tax Claim" is an Unsecured Claim of a governmental unit entitled to priority in payment pursuant to any provision of the Bankruptcy Code section 507(a)(8). The primary Priority Tax Claim is a claim filed by the New York State Department of Taxation and Finance which asserts a total claim of $93,931.88. A portion of this Claim has been asserted as a Secured Claim based upon tax warrants recorded in New York County. However, these tax warrants were filed after both Timberland and Amex filed UCC-1 financing statements. As such, the Plan is treating New York State's entire proof of claim consisting almost exclusively of sales tax as a Priority Tax Claim. The Plan provides the New York State's Allowed Priority Tax Claim shall be paid in full no later than July 31, 2020 from the liquidation of the Debtor's assets. In the event, there are insufficient funds from the liquidation of the Debtor's assets to pay New York State's Allowed Priority Tax Claim, Michael Pease shall enter into an installment payment agreement with New York State to pay the balance over time.  The Internal Revenue Service filed a Priority Tax Claim in the amount $466.68 which shall be paid in full no later than July 31, 2020.

**2.    Class 1 – Timberland Bank's Secured Claim**

Class 1 consists of Timberland's Secured Claim.  Pursuant to section 506(a) of the Bankruptcy Code, a Claim is secured only up to the value of the collateral securing the Claim and unsecured for the balance.  The Debtor estimates the value of all of its personal property such as restaurant equipment including, convection ovens, low boys, panini presses and the like, have a value of no more than $20,000.00.  As such, Timberland's Allowed Class 1 Claim shall be deemed to be $20,000.00 and the balance of its Claim of approximately $418,00.00 shall be treated as a Class 2 Unsecured Claim.  The Plan provides that Timberland's Class 1 Claim shall be paid in full in cash no later than July 31, 2020 from either the liquidation of the Debtor's personal property or from cash on hand.  Nothing in the Plan shall be deemed to release any claims Timberland may have against any person or entity other than the Debtor.  Class 1 is impaired as that term is defined in §1124 of the Bankruptcy Code and entitled to vote for or against the Plan.

**3.    Class 2 - General Unsecured Claims**

Class 2 consists of the holders of General Unsecured Claims which includes all claims, such as ordinary trade creditors. It also includes Amex's Claim because Amex's lien is junior to Timberland's lien on the Debtor's personal property. The Debtor estimates the total amount of Allowed Unsecured Claims will be approximately $1,050,000.00 based upon the filed Claims as well as Scheduled Claims.

The Plan provides for a Pro Rata Distribution of $20,000.00 to Holders of Allowed Class 2 Claims in full settlement and satisfaction of their Claims paid no later than July 31, 2020.  This equates to an approximate two percent (2%) Distribution to holders to Allowed Class 2 Claims. Holders of Allowed Class 2 Claims are impaired as that term is defined in §1124 of the Bankruptcy Code and entitled to vote for or against the Plan.

4. **Class 3 - Equity Interest Holders**

Class 3 consists of the Debtor's Equity Interest Holders. On the Effective Date of the Plan, all Class 3 Equity Interest Holders shall have their Equity Interest in the Debtor terminated and canceled. Class 3 Equity Interest Holders shall receive no Distribution or monetary payment on account of their Equity Interest in the Debtor. Class 3 is impaired as that term is defined in §1124 of the Bankruptcy Code.

C. **Conditions to and Means for Consummation of the Plan**

1. **Condition to Occurrence of the Effective Date**

The Effective Date shall be the date on which the Confirmation Order shall have been entered and become a Final Order.

2. **Funding of the Plan**

This Plan is currently based upon the assumption the Debtor will be unable to continue operating from the 23rd Street Property and will be unable to secure a new location. As such, the Plan will be funded from the liquidation of the Debtor's assets which consist of used restaurant machinery and equipment as well as a 2014 Isuzu refrigerated box truck. The Plan will also be funded by cash on hand in the Debtor's in possession bank account at the time the restaurant closes. Unless the 23rd Street Property landlord agrees otherwise, it is expected the Debtor will cease operations at the 23rd Street Property in June or July of 2020. In the event the Debtor is successful in securing a new location and can continue to operate, the Debtor will likely file an amended Plan.

D. **Objections to Claims**

The Plan provides that all objections to Claims shall be filed by the Debtor and served on the holders of such Claims within sixty (60) days of the Confirmation Date. If the objection to a proof of Claim that relates to a Disputed Claim has not been filed by the applicable date, the Claim

to which the proof of Claim relates shall be treated as an Allowed Claim for purposes of distributions under the Plan.

**E.**    **Resolution of Disputed Claims**

The Plan provides that Disputed Claims shall be divided into two (2) portions: the "non-disputed portion" and the "disputed portion".  The Disbursing Agent shall pay the non-disputed portion of a Disputed Claim in accordance with Plan provisions for payment of a Claim in its Class.

**F.**    **Estimation**

The Plan provides that the Debtor may, at any time, request that the Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor has previously objected to such Claim.  The Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to such Claim.

**G.**    **Allowance of Disputed Claims**

The Plan provides that if, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall, within thirty (30) days after the date on which the Claim becomes an Allowed Claim, or as soon thereafter as is practicable pay to the holder of such Allowed Claim the amount of Cash that such holder would have been entitled to receive under this Plan if such disputed portion of such Claim had been an Allowed Claim on the Effective Date.  Notwithstanding anything to the contrary contained in this Plan, the Disbursing Agent shall make a Distribution on the non-disputed portion of an Unsecured Claim in accordance with the provisions of the Plan.

**H.**    **Limitation on Liability**

The Plan provides that the Debtor, and its respective officers, directors, shareholders, employees, trustees, members, affiliates and agents (including any professional entities employed by one or more of them), shall have any liability to any holder of an Administrative Claim, Claim or

Equity Interest, or any other person, for any act taken or omission made since the Filing Date or in connection with, related to, or arising out of, the formulation, implementation, confirmation or consummation of the Plan, the Disclosure Statement, or any other contract, instrument, release, agreement or document created in connection with the Plan, the pursuit of approval of the Disclosure Statement, the solicitation of votes for the Plan, the pursuit of the confirmation of the Plan, or the administration of the Debtor's case, the Plan or the property to be distributed under the Plan, except for the willful misconduct, gross negligence or breach of fiduciary duty as determined by Final Order of the Bankruptcy Court and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**I.      Certain Other Provisions of The Plan**

The Plan contains other provisions consistent with the requirements of Chapter 11 of the Code, including provisions for the Distribution of Cash and the collection and disposition of assets of the Debtor's Estate.

**1.      Causes of Action**

Except as otherwise provided herein or in any contract, instrument, release or other agreement entered into in connection with the Plan, the Reorganized Debtor shall retain, and may, with its determination of the best interest of the estate, enforce any claims, rights and causes of action that have been or may be commenced by the Debtor including, but not limited to, those arising under Sections 544 through 550 of the Bankruptcy Code or any similar provisions of state law, or any statute or legal theory. The Debtor is unaware of any such causes of action.

**2.      Disbursing Agent**

Tarter Krinsky & Drogin LLP shall act as Disbursing Agent on behalf of the Debtor for the purpose of making the Distributions required on the Effective Date under the Plan.  Scott S. Markowitz shall be in charge of all matters relating to Disbursements required by the Plan on the Effective Date.  In the event that the Disbursing Agent changes prior to the entry of an order of final

decree closing the Debtor's Chapter 11 case, the Bankruptcy Court and the United States Trustee shall be notified in writing of the identity and address of the new Disbursing Agent.   The Reorganized Debtor shall be responsible to make all Plan payments subsequent to the Distributions made on the Effective Date.

### 3.        Payments by Cash

Payments to be made by the Disbursing Agent pursuant to the Plan shall be made by check drawn on a domestic bank.

### 4.        Unclaimed Distributions

The Plan provides that Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Proofs of Claim filed by such holders unless no Proof of Claim has been filed, in which case then to the address set forth on the Schedules filed with the Court, unless superseded by a written notice to the Disbursing Agent providing actual knowledge to the Disbursing Agent of a change of address.

The Plan further provides that If any holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Disbursing Agent is notified in writing of such holder's then current address, at which time all Distributions shall be made to such holder, without interest.

### 5.        Executory Contracts and Unexpired Leases

(a)        **Assumption and Rejection Generally.**   Subject to approval of the Bankruptcy Court, the Bankruptcy Code empowers a debtor-in-possession to assume or reject executory contracts and unexpired leases.  As a general matter, an "executory contract" is a contract under which material performance (other than the payment of money) remains due by each party thereto.  If an executory contract is rejected, the non-debtor party to that contract may file a Claim for any damages incurred by reason of the rejection.  In the case of rejection of leases for non-residential real property, resulting damage Claims are subject to certain limitations imposed by the

Bankruptcy Code. If an executory contract or unexpired lease is assumed, the debtor-in-possession is bound to perform its obligations arising thereunder in accordance with the terms of such agreement.

(b) **Assumption of Executory Contracts and Unexpired Leases.** As set forth above, the Bankruptcy Court has previously approved the assumption of the Leases. The Debtor is unaware of any other executory contracts.

6.     **Professional Fees and Expenses**

The Plan provides that each of the Professionals requesting compensation in the Chapter 11 Case shall file an application for an allowance of final compensation and reimbursement of expenses in the Chapter 11 Case incurred through the Confirmation Date within forty-five (45) days after the Confirmation Order.

7.     **Retention of Jurisdiction**

The Plan provides that, from and after the Confirmation Date and until such time as all payments and Distributions required to be made by the Debtor have been made, the Bankruptcy Court shall retain jurisdiction over the Debtor's Chapter 11 Case for all purposes permitted under the Code, including, without limitation, the following:

(a) To hear and determine any dispute relating to the Plan or any property described in the Plan and to enforce its provisions.

(b) To hear and determine all issues arising out of any motions, applications, adversary proceedings or contested or litigated matters in the Chapter 11 Case pending at the Confirmation Date or commenced thereafter.

(c) To order recovery of any assets of the Debtor, whether title is presently held in the name of the Debtor or a third party.

(d)      To hear and determine motions to approve the sale of assets of the Debtor under Section 363 of the Bankruptcy Code and/or the rejection or assumption of executory contracts under Section 365 of the Bankruptcy Code.

(e)      To hear and determine all issues relating to any purchases, sales or contracts made or undertaken by the Debtor during the pendency of the Chapter 11 Case.

(f)      To hear and determine all Claims arising from the rejection of executory contracts or unexpired leases.

(g)      To hear and determine all objections to Claims and all controversies concerning classification, allowance, valuation, liquidation, estimation, or satisfaction of Claims.

(h)      To make orders allowing amendment of the Schedules filed in the Chapter 11 Case for any purpose including, without limitation, to prosecute objections to Claims not previously listed as disputed, contingent or unliquidated.

(i)      To hear and determine all applications for compensation of professional and similar fees and reimbursement of expenses arising out of or relating to the case or any Claims.

(j)      To hear and determine any and all motions to abandon property of the Debtor's Estate.

(k)      To make such other orders or give such directions as permitted by Section 1142 of the Bankruptcy Code.

(l)      To consider and order any modifications or amendments requested to the Plan.

(m)      To remedy any defect or omission or reconcile any inconsistency in the Plan or the Confirmation Order in such manner as may be necessary or desirable to carry out the purposes and intent of the Plan.

(n)      To make all orders necessary or appropriate to carry out the provisions of the Plan.

(o)    To enforce all orders previously entered by the Bankruptcy Court.

(p)    To determine such other matters as may be provided for in the Confirmation

Order or as may be authorized under the Bankruptcy Code.

**8.    Management of the Reorganized Debtor**

As set forth above, this Plan is premised on the Debtor's ceasing operations of the

restaurant and there will be no future operations.

**VI**

**CONFIRMATION PROCEDURES**

In order for the Plan to be confirmed by the Bankruptcy Court, all of the applicable

requirements of Bankruptcy Code Section 1129 must be met.   These include, among others,

requirements that the Plan: (i) is accepted by all impaired Classes or, if rejected by an impaired

Class, "does not discriminate unfairly" and is "fair and equitable" as to each rejecting Class; (ii) is

feasible; and (iii) is in the best interests of holders of Claims or Equity Interests in each impaired

Class.

**A.    Solicitation Of Votes; Acceptance**

The Debtor is soliciting the acceptance of the Plan from all holders of Claims in Classes that

are impaired under the Plan and receiving Distributions thereunder.   Using these criteria, holders of

only Claims in Class 1 and 2 are entitled to vote on the Plan.   In addition, a vote may be disregarded

if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or

procured or made in good faith or in accordance with the applicable provisions of the Bankruptcy

Code.

Class 2 will be deemed to have accepted the Plan if the Plan is accepted by holders of at

least two-thirds in dollar amount and more than one-half in number of the Claims in that Class that

have cast ballots on the Plan.

B.    **Confirmation Hearing**

Bankruptcy Code Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing") after the period for submission of Ballots has expired.  The Confirmation Hearing may be postponed from time to time by the Bankruptcy Court without further notice except for an announcement of the postponement made at the Confirmation Hearing.  Bankruptcy Code Section 1128(b) provides that any party in interest may object to confirmation of the Plan.  Objections must be made in writing, specifying in detail the name and address of the person or entity objecting, the grounds for the objection and the nature and amount of the Claim held by the objector, and must otherwise comply with the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules.  Objections must be filed with the Clerk of the Bankruptcy Court, with a courtesy copy delivered to the chambers of the Honorable James L. Garrity, Jr., and served upon the parties so designated in the Order and Notice accompanying this Disclosure Statement on or before the time and date designated in such Order and Notice.

**FAILURE TO TIMELY FILE AND SERVE AN OBJECTION TO CONFIRMATION MAY BE DEEMED BY THE BANKRUPTCY COURT TO BE CONSENT TO CONFIRMATION OF THE PLAN.**

At the Confirmation Hearing, the Bankruptcy Court will determine, among other things, whether the following confirmation requirements specified in Bankruptcy Code Section 1129 have been satisfied:

1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

2.    The Debtor has complied with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means proscribed by law.

4.    Any payment made or promised by the Debtor for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the

Chapter 11 Case, has been approved by, or is subject to approval of, the Bankruptcy Court as reasonable.

5.      The Debtor has disclosed the identity and affiliations of all individuals proposed to serve, after confirmation, as directors or officers of the Debtor and the appointment to or continuance in such positions by those individuals is consistent with the interests of creditors and Equity Interest holders and with public policy; and (b) the Debtor have disclosed the identities of any insider(s) that will be employed or retained by the Reorganized Debtor and the nature of any proposed compensation for such insider(s).

6.      Each holder of a Claim in an impaired Class either has accepted the Plan or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code.  See "Best Interests Test" below.

7.      Unless the Debtor is required to seek nonconsensual confirmation of the Plan, each Class of Claims and Equity Interests has either accepted the Plan or is not impaired under the Plan.

8.      Except to the extent that the holder of a Claim has agreed to different treatment, the Plan provides that: (a) Allowed Administrative Claims will be paid in full on the later of the Effective Date, or the date the Claim is Allowed; (b) other Priority Claims will be paid in full on the Effective Date; and (c) Priority Tax Claims will receive payment in full plus interest over six (6) years.

9.      At least one impaired Class has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

10.      Confirmation of the Plan is not likely to be followed by the liquidation of or the need for further financial reorganization by the Debtor or the Reorganized Debtor unless the Plan is a liquidation plan.

C.      **Best Interests Test**

As mentioned above, confirmation of the Plan requires that each holder of a Claim in an impaired Class must either: (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Debtor believes that a liquidation of the Debtor will provide the holders of Class 2 Allowed Claims with a lesser Distribution than under the Plan.  Annexed hereto as **Exhibit "B"** is a liquidation analysis which estimates the likely Distribution to holders of Allowed Class 2 Claims if the Debtor's Chapter 11 Case is converted to Chapter 7.[2]  The Debtor has estimated the value of its assets based upon its assessment of a variety of factors including, the well-known fact, used restaurant equipment often has little or no resale value.  The liquidation analysis indicates that in a liquidation holders of Allowed Unsecured Claims would receive no Distributions on account of their claims primarily because a chapter 7 trustee's professional fees and expenses would be paid prior to holders of Class 2 Claims as well as the amounts due to Priority Tax Claims and the Class 1 Secured Claimholder.

D.      **Cram Down**

The Bankruptcy Code provides a mechanism by which a plan may be confirmed even if it has been rejected by an impaired class of claims.   Under the "cram down" provisions of the Bankruptcy Code (§1129(b)), the proponent of the Plan (in this case the Debtor) may request that it be confirmed despite its rejection by an impaired class, and the court will confirm the Plan if it (i) does not discriminate unfairly against a dissenting impaired class and (ii) is fair and equitable with respect to such class.

---

[2]  The liquidation analysis is based upon management's best estimate of a likely recovery in an orderly liquidation scenario.

The Bankruptcy Code sets forth specific guidelines for determining whether a plan is fair and equitable with respect to a particular class of claims. For unsecured claims, as are those in Class 2, a plan must provide that equity security holders do not receive or retain any property in account of their interest. Here, if Class 2 votes to reject the Plan, since the Debtor's Equity Interest Holders are not retaining any interest in the Reorganized Debtor, the Debtor believes the Court could still confirm the Plan under section 1129(b) of the Bankruptcy Code assuming Class 1 accepts the Plan. For Secured Claims, as are in Class 1, a plan must provide that the holders of such Secured Claim retain the lien securing such claim to the extent of the allowed amount of such claim and that the holder of such claim receive on account of such claim of a value, as of the Effective Date of the Plan, of at least the value of such holders interest in the estate's interest in the property securing the lien. In other words, the secured creditor must receive the present value of the Allowed Amount of its Secured Claim which allowed amount is dependent upon the value of the property securing the loan. Here, the Debtor believes Class 1 is being paid the full amount of its Allowed Secured Claim.

In the event the Bankruptcy Court refuses to impose a "cram down" on the rights of a non-consenting class unless certain modifications are made to the terms and conditions of such non-consenting class' treatment under the Plan, the Debtor reserves the right, without re-solicitation, to propose such modification to such non-consenting class' treatment and to confirm the Plan, provided such modification does not result in total extinguishment of the non-consenting class' claim.

## VII

## CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

### 1.    Tax Effect of Plan

Certain possible material federal income tax consequences of the Plan under the Internal Revenue Code of 1986 (as amended, the "Tax Code"), are described below. Because of the

complex nature of the transactions comprising the Plan, the differing tax postures of the holders of Claims, the Debtor and its members, and the possible differing characterizations of the transactions under the Tax Code by the IRS, the Debtor and its members, the material federal income tax consequences described herein are subject to significant uncertainties and variations in application. There may also be material consequences and/or possible results not described herein.

The analysis and conclusions in the discussion set forth below are based upon the Debtor's interpretation of provisions of the Tax Code, Treasury regulations, proposed Treasury regulations, and rulings and judicial decisions in effect as of the date of this Disclosure Statement, all of which are subject to change (possibly with retroactive effect). It should be noted that certain tax consequences of the Plan may be subject to different interpretation under existing law, and may be predicated on circumstances not readily ascertainable at this time or not within the control of the Debtor. The interpretations of the Debtor are not binding on the IRS. Thus, there can be no assurance that the IRS will not take a different position concerning the consequences of the Plan and that any such position would be sustained. The Debtor has not obtained and does not intend to seek any advance rulings from the IRS with respect to any federal tax matter, and no opinion of counsel has been or will be requested or obtained by the Debtor with respect to any tax aspects of the Plan.

**THE DISCUSSION SET FORTH BELOW IS INCLUDED HEREIN FOR GENERAL INFORMATION ONLY. ACCORDINGLY, IT IS STRONGLY RECOMMENDED THAT HOLDERS OF CLAIMS AND MEMBERS OF THE DEBTOR SHOULD CONSULT THEIR RESPECTIVE TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES OF THE PLAN TO SUCH PERSON, INCLUDING THE APPLICATION AND EFFECT OF FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX LAWS.**

A.      **Federal Income Tax Consequences**
        **To Holders of Claims**

The Federal income tax consequences to a holder of Claims receiving, or entitled to receive, a Distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the Claimholders' method of accounting, and its own particular tax situation.  Because Claimholders' tax situations differ, Claimholders should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.

Among other things, the federal income tax consequences of a Distribution to a Claimholder may depend initially on the nature of the original transaction pursuant to which the Claim arose.  For example, a Distribution in repayment of the principal amount of a loan is generally not included in the Claimholders gross income.

The federal income tax consequences of a Distribution to a Claimholder may also depend on whether the item to which the Distribution relates has previously been included in the Claimholders gross income or has previously been subject to a loss or bad debt deduction.  For example, if a Distribution is made in satisfaction of a receivable acquired in the ordinary course of the Claimholders trade or business, and the Claimholder had previously included the amount of such receivable Distribution in its gross income under its method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the Distribution should not result in additional income to the Claimholder but may, as discussed below, result in a loss.  Conversely, if the Claimholder had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the Claimholder generally would be required to include the amount of the Distribution in income when received.

A Claimholder receiving a Distribution in satisfaction of its Claim generally may recognize taxable income or loss measured by the difference between (i) the cash and the fair

market value (if any) of the property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. This income or loss may be ordinary income or loss if the Distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Claimholders trade or business for the performance of services or for the sale of goods or merchandise. In addition, if a Claimholder had claimed an ordinary bad debt deduction for the worthlessness of its Claim in whole or in part in a prior taxable year, any income realized by the Claimholder as a result of receiving a Distribution may be taxed as ordinary income to the extent of the ordinary deduction previously claimed. Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the Claimholders hands.

**B. Federal Income Tax Consequences of The Transactions Contemplated Under the Plan to the Debtor and the Debtor's Members**

The following discussion is intended to provide a summary of the Federal income tax reporting positions that it is anticipated the Debtor will likely adopt based on its present knowledge of the facts. The Debtor reserves the right to reconsider the manner of reporting of any of these matters to the extent that circumstances and the relevant facts are at variance from the Debtor's best assessment of circumstances and facts known at this time. This discussion is only provided to assist the Debtor's members in evaluating how the contemplated tax reporting positions affect them for federal income tax purposes.

**THE DEBTOR AND ITS PROFESSIONAL ADVISORS DO NOT INTEND TO AND ARE NOT GIVING TAX OR OTHER LEGAL ADVICE TO ANY MEMBER. MEMBERS SHOULD CONSULT THEIR OWN TAX ADVISORS TO DETERMINE HOW THE PLAN AFFECTS THEM FOR FEDERAL, STATE AND LOCAL TAX PURPOSES, BASED ON THEIR PARTICULAR TAX SITUATIONS.**

1. **Limited Liability Company**

The Debtor is a New York limited liability company that is treated as a partnership for federal income tax purposes and will be treated as continuing in existence as a partnership for tax reporting purposes until the Effective Date.  A partnership is not itself a taxpaying entity for federal income tax purposes, and the partnership's income or loss (and items thereof) for each taxable period during which it remains in existence is allocated among the partners, who are required to report the income or loss (and items thereof) allocated to them on their own tax returns.

Generally, a partner is not allowed to deduct his or her share of partnership losses for the year in excess of the adjusted basis of his or her interest in the partnership, determined as of the end of the partnership's taxable year in which the loss occurs.  Any excess is allowed in any subsequent year in which the adjusted basis increases.  A partner's basis is initially the cash or adjusted basis of property contributed to the partnership.  Thereafter, basis increases for such items as additional contributions and the partner's share of taxable and tax-exempt income and gain, and basis decreases for such items as distribution and the partner's share of losses.

An increase in a partner's share of partnership liabilities or a partner's assumption of partnership liabilities is treated as a cash contribution to the partnership that increases basis, and a decrease in a partner's share of liabilities or the assumption by the partnership of a partner's liabilities decreases basis, but never below zero. (Cash distributions, including a decrease in a partner's share of partnership liabilities, in excess of basis is taxable and generally treated as a gain from the sale of a partnership interest).  A partner shares partnership recourse liabilities to the extent the partner bears the economic risk of loss with respect to that liability, i.e., based on a hypothetical partnership liquidation at a time when the partnership has no assets, and after taking into account any rights of contribution or reimbursement from other partners or third parties that are related to other partners.

A partner is not allowed to deduct his or her share of partnership losses for the year

in excess of the amount the partner is deemed to be "at risk" with regard to the partnership. Generally, a partner is deemed to be "at risk" to the same extent that the partner has basis in his or her partnership interest, except that a partner's share of recourse liabilities (included in tax basis) are excluded from the computation if the partner is in any way protected against loss (<u>e.g.</u>, by the existence of a guarantee) and the partner's share of non-recourse liabilities (included in tax basis) are excluded unless the non-recourse liabilities represent "qualified non-recourse financing" which is generally secured real estate financing obtained from an unrelated lender engaged in the business of lending money.

The Tax Code has special rules that limit the use of losses from certain "passive activities" in which the taxpayer does not materially participate.  These loss limitation rules do not apply, however, to an entity, such as the Debtor's, if the taxpayer claiming the loss materially participated in the activity at any time during <u>any</u> three prior years (even if such participation was not consecutive).

Passive losses that cannot be currently used will be carried forward and applied against subsequently generated passive income.  At the time the partner is no longer treated as a partner of the Debtor for federal income tax purposes, such suspended passive losses will become available to offset active income and portfolio income (after first being applied against any other passive income).

### 2.    <u>Continuation of the Partnership</u>

Under federal income tax law, a partnership is generally considered to remain in existence until it no longer has any assets to distribute.

The Debtor will be treated as remaining in existence as a partnership for tax purposes.

### 3.    <u>Partnership Recognition of</u><br><u>Cancellation of Indebtedness Income</u>

Cancellation of indebtedness income ("COD Income") is recognized by a

partnership to the extent, and at the time, that certain non-deductible debts are discharged for less than full payment. The COD Income recognized at the partnership level is then allocated among the partners pursuant to the allocation provisions of the partnership agreement, if such provisions comply with the requirements of the Tax Code regarding allocations, or, if not, in accordance with the partners' interests in the partnership. The Tax Code's bankruptcy and insolvency exceptions to the general rule regarding recognition of COD Income apply at the partner level and not at the partnership level.

The Debtor believes it may realize COD Income pursuant to implementation of the Plan. There is no assurance that the Debtor will, in fact, derive sufficient taxable losses to offset its COD Income. To the extent that the amount of losses available to be allocated to the Debtor's members is less than the amount of COD Income, the members may have ordinary income that may increase the positive balances of their individual capital accounts unless the members are themselves insolvent or file their own bankruptcy petitions. **The Debtor's members should consult their own tax advisors to determine the effects of any COD Income.**

    4.      **Tax Return Filings and Substantial Authority**

The Debtor will file its partnership income tax returns and take the positions set forth above, provided it continues to believe that these positions are reasonable under then existing federal income tax law, and have a realistic possibility of success if challenged by the IRS and litigated. In addition, at the time these returns were due, these positions will be evaluated to determine whether there is "substantial authority", within the meaning of the Tax Code Section 6662(d)(2)(B) and the regulations thereunder, for each such position. The Debtor may take steps to avoid the imposition of any penalties such as disclosing the position on the Debtor's income tax return in the manner necessary to avoid the imposition of the substantial understatement of income tax penalty set forth in Tax Code Section 6662(d). No assurance can be given, however, that the

IRS will not challenge the existence of substantial authority with respect to any position or, in the absence of substantial authority, the adequacy of the disclosure. Members should consult with their respective personal tax advisors regarding these disclosure requirements and the possible effect on them of the imposition of the substantial understatement penalty.

      5.      **Interest and Penalties**

If the IRS were to challenge any of the tax return reporting positions being adopted by the Debtor, it may seek to impose penalties on the members, in addition to any federal income taxes, and interest thereon, it claimed was due and owing. There can be no assurance that penalties will not be imposed with respect to any adopted tax reporting position that is successfully challenged. Members should consult with their respective personal tax advisors regarding the possible imposition of penalties and the amount of any interest on the underpayment of taxes.

**VIII**

**VOTING INSTRUCTIONS**

Creditors should complete and sign the enclosed Ballot and return it to Tarter Krinsky & Drogin LLP, 1350 Broadway, 11th Floor, New York, New York 10018, Attn: Scott S. Markowitz, Esq., attorneys for the Debtor.

A ballot is enclosed with each copy of this Disclosure Statement being sent to all holders of Impaired Claims that filed proof of Claims or were scheduled by the Debtor. Ballots must be received on or before 5:00 p.m. Eastern Daylight Time on April __, 2020.

If a ballot is damaged or lost, or if you have any questions concerning any voting procedures, you may contact Tarter Krinsky & Drogin LLP, attorneys for the Debtor, 1350 Broadway, 11th Floor, New York, New York 10018 (212) 216-8000, Attention: Scott S. Markowitz, Esq.

## IX

## **CONCLUSION**

The Debtor believes that confirmation and implementation of the Plan is preferable to any other alternative.  Accordingly, the Debtor urges holders of Claims to vote to accept the Plan by so indicating on their Ballots and returning them as specified in the Order and Notice accompanying this Disclosure Statement.

Dated: New York, New York
        January 21, 2020

**COCHRAN & PEASE, LLC**                **TARTER KRINSKY & DROGIN LLP**
*Debtor and Debtor-in-Possession*        *Attorneys for Cochran & Pease, LLC*
                                         *Debtor and Debtor-in-Possession*


By: /s/ Michael Pease_____     By: /s/ Scott S. Markowitz_____
        Michael Pease                            Scott S. Markowitz, Esq.
        Managing Member                          1350 Broadway, 11th Floor
                                                 New York, New York 10022
                                                 Phone: (212) 216-8000
                                                 Email: smarkowitz@tarterkrinsky.com